IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| CHRISTOPHER JOSEPH HALL | § | |
| TDCJ-CID NO. 1565195 | § | |
| v. | § | C.A. NO. C-12-093 |
| | § | |
| RICK THALER | § | |

**MEMORANDUM AND RECOMMENDATION TO**
**GRANT RESPONDENT'S MOTION FOR SUMMARY JUDGMENT**

Petitioner is a state prisoner currently incarcerated at the Allred Unit in Iowa Park, Texas.

Proceeding pro se, he filed this habeas corpus petition pursuant to 28 U.S.C. § 2254, challenging

his conviction. (D.E. 1). Pending is Respondent's motion for summary judgment. (D.E. 12).

Petitioner filed responses opposing this motion. (D.E. 14, 15). For the reasons stated herein, it

is respectfully recommended that Respondent's motion for summary judgment be granted, and

that this habeas petition be dismissed.

**I. JURISDICTION**

The Court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C.

§§ 2241, 2254, which provide that jurisdiction is proper where the inmate is confined, or where

the conviction was obtained. Wadsworth v. Johnson, 235 F.3d 959, 961-62 (5th Cir. 2000).

Petitioner was convicted in Aransas County, Texas. (D.E. 1, at 2). Therefore, jurisdiction is

proper in this Court. 28 U.S.C. § 124(b)(6).

**II. FACTUAL BACKGROUND**

In the early morning of January 4, 2008, an Aransas County Sheriff's Deputy responded

to a disturbance reported at a trailer occupied by victim Aaron Watson, his wife Tracy Watson,

and their two young daughters. Pate v. Texas, No. 13-09-00149-CR, 2010 WL 3921177, at *1,

& 1 n.4 (Tex. App. Oct. 7, 2012) (unpublished). At the scene, the deputy discovered Aaron

Watson lying on the ground outside an adjacent residence having sustained gunshot wounds to his abdomen.  Id. at *1.  Mr. Watson was transported to a hospital where he soon died from his injuries.  Id.  At the crime scene, deputies recovered three shell casings for a .38-caliber firearm inside the trailer, a baseball bat in the front yard, and a long sleeve denim shirt that belonged to the victim in the adjacent backyard.  Id.  The shirt was punctured by a bullet hole and covered with what was later determined to be the victim's blood.  Id.

Investigator Michael Brooks led the investigation into the incident, and he eventually identified Petitioner as one of five co-suspects.  Id.  He spoke with Ms. Watson, who had not been present the night of the killing.  Id. at *2.  According to her, at some point in 2007 the victim had moved out of their trailer and she had subsequently begun an intimate relationship with Chadrick B. Pate.  Id. at *7.  Then in November 2007, Pate brought a couple of men to the trailer to beat up a man who had apparently tried to rape Ms. Watson.  Id. at *2, *7-8.  She identified the two visitors as "Thunderwood" and "Ziggy," who Investigator Brooks was able to determine referred to Michael Underwood and Petitioner, respectfully.[1]  Id. at *2, & 2 n.6.

Based on Ms. Watson's statement, Investigator Brooks presented photographic arrays featuring Underwood to the victim's daughters who were at the trailer the night of the incident.  Id. at *2.  After both girls identified him as being present that night, Underwood was arrested.  Id.  He then gave a statement to the police implicating Petitioner and three other men as suspects, including Chadrick Pate, who was later tried alongside Petitioner, as well as Anthony Ray and Kevin Tanton.  Id.  Upon arrest, Ray and Tanton both gave statements to the police consistent

---

[1] In addition, Ms. Watson told Investigator Brooks that prior to the killing Mr. Watson had owed four hundred dollars to an individual known as "Doughboy," later determined to refer to Justin Padgett, who was ultimately eliminated as a suspect.  Pate, 2010 WL 3921177, at *2 nn.5, 7.

with Underwood's account.  Id. at *2, *3-5.  In addition, Tanton provided information that led to the recovery of a weapon from the bottom of Copano Bay by a police dive team.  Id. at *2.  The weapon, a .38-caliber revolver, was introduced into evidence at trial.  Id.

Underwood, Ray, and Tanton, who were charged as co-defendants along with Petitioner and Pate, all testified at trial.  Id. at *1-2.  Their testimonies indicated that on January 4, 2008, the three men traveled with Petitioner and Pate to what they believed to be Pate's trailer.  Id. at *3, *5.  All five defendants were members of a prison gang known as the Aryan Circle.  Id. at *3-5.  Apparently, Underwood, Ray, and Tanton were under the impression that they were going to the trailer to confront members of a rival gang who, according to Underwood, were holding Pate's "kids and his old lady hostage."  Id. at *5.  When the group arrived, they first gathered at a small shed near the trailer.  Id. at *3.  Pate then abandoned the group and disappeared into the woods while the remaining four approached the trailer.  Id. at *3-5.  Petitioner was carrying a revolver.  Id.  When they arrived at the entrance, one of the victim's daughters opened the door.  Id. at *5.  Other than her, Underwood, Ray, and Tanton testified that they saw a man who they later learned to be Mr. Watson lying on a small bed near the entrance of the trailer.  Id. at *3-5.

While Underwood and Tanton ushered the girl to a back room and shut the door, Ray and Petitioner confronted Mr. Watson on the bed.  Id. at *4-5.  A struggle between the men ensued, and at some point Petitioner shot Mr. Watson in the abdomen.  Id.  After being shot, Mr. Watson attempted to chase the four men from the trailer, causing them to flee in their cars.  Id. at *4, 6.  While passing over the Copano Bay Bridge, Tanton complied with Petitioner's instructions to throw the revolver and a sock filled with the remaining bullets over the bridge.  Id.

In addition to the testimony of Underwood, Ray and Tanton, the prosecution offered

seventeen other witnesses.  Id. at *1.  Among them included Deputy Keith Pikett of the Fort

Bend County Sheriff's Office.  Id. at *2.  Deputy Pikett "testified that he is a 'dog handler' and

that he has used his bloodhounds to make 'scent identifications' at crime scenes '[t]housands of

times.'"  Id.  Petitioner's attorney made a motion to suppress Deputy Pikett's testimony, and the

trial court held a hearing on the matter outside the presence of the jury.  Id. at *2-3.  At the

hearing, Deputy Pikett described his methodology:

> Well, we take and put out six quart-size paint cans that are
> numbered so you can tell one from another.  And we put it so that
> the wind is crossways so the scent is not blowing from Can Two
> into Can Three or One; it's blowing this way so it's not affecting
> it. Then somebody other than myself sets out six scents of six
> people and we do it by race and sex, so I ask them and I have bags
> of hundreds of whites and blacks and Asians.
>       And so they pick filler scents and the scents of the potential
> suspects.  They place them out in the cans.  I don't know which
> person's in which can.  And then we bring the dogs out–I have
> three of them I'm using in this case–one at a time.  They're
> allowed to smell some piece of evidence, and what they're doing is
> trying to see [if] the smell on this piece of evidence [is] the same
> as the smell on one of these cans.  And the key to this is the dog is
> given the same reward if he picks somebody in one of the six cans
> or if he picks nobody, they're praised and given a reward.  So they
> have no reason to just even pick a can at random.

Id.  Deputy Pikett then explained that he had his dogs smell the shell casings that had been

collected at the murder scene, and that each dog alerted to a can containing Petitioner's scent.

Id. at *3.  He also performed three scent matching tests using the denim shirt found at the crime

scene.  Id.  According to Deputy Pikett, the dogs unanimously alerted to cans containing

Petitioner's, Ray's, and Underwood's scents in each of the tests.  Id.

      On cross-examination, Deputy Pikett admitted that "the dogs are not infallible," and

conceded that a dog's sickness, for example, might affect its sense of smell.  Id.  He did,

4

however, vouch for the accuracy of the three particular dogs used in Petitioner's case.  Id.  Out

of all the scent identifications the dogs had performed since 2000 or 2001, one of the dogs was

"now up to twenty-three hundred and thirty-four cases with [only] two errors and the other dogs

[had] no errors."  Id.  Based on this testimony, the trial court overruled defense counsel's motion

to suppress, finding that Deputy Pikett was a qualified expert in the field.  Id. at *2-3; (D.E. 9-21,

at 28).  The trial court's ruling was consistent with the leading Texas Court of Appeals case at

the time, which had established Deputy Pikett as an expert.  (D.E. 9-21, at 26-28); see also

Winston v. State, 78 S.W.3d 522, 528-29 (Tx. App. 2002).

    In addition to Deputy Pikett's testimony, the prosecution offered the victim's daughters

as witnesses.  The girls both testified to having identified Petitioner as being present at the scene

in a photographic lineup prior to trial.  (D.E. 9-25, at 67; D.E. 9-26, at 22-25); Pate, 2010 WL

3921177, at *2.  In addition, one daughter testified that the gunman was carrying a firearm that

she described as being the "western kind" with a small wheel on it, which was consistent with

the gun actually recovered.  (D.E. 9-25, at 44).

    On June 24, 2008, a grand jury indicted Petitioner along with the other four suspects on

counts of murder and engaging in organized criminal activity.  (D.E. 9-9, at 6-7).  The murder

count of the indictment alleged that those individuals, "acting alone and together," intentionally

or knowingly caused the death of Aaron Watson on or about January 4, 2008 by shooting him

with a firearm.  (D.E. 9-9, at 6-7).  After Underwood, Ray, and Tanton made their initial

statements to the police, each entered into an agreement with the State whereby they would

provide testimony against Petitioner and Pate in exchange for a recommended sentence of fifteen

years or less.  Pate, 2010 WL 3921177, at *1.  Petitioner and Pate were tried together, and the

jury found them both guilty of murder.  Id.; (D.E. 9-10, at 33).  Petitioner was sentenced to

ninety-nine years and was ordered to pay $10,000 in fines.  Pate, 2010 WL 3921177, at *1.

### III.  PROCEDURAL BACKGROUND

Petitioner timely appealed his conviction to the Court of Appeals for the Thirteenth

District of Texas.  He raised three grounds for reversal: (1) the jury charges contained errors; (2)

the prosecutor made an improper statement during closing argument; and (3) the trial court

abused its discretion by admitting photographs of Petitioner's tattoos as well as evidence of

Deputy Pikett's canine scent lineup.  (D.E. 9-1, at 11-12).  On August 7, 2010, the Court of

Appeals affirmed the conviction.  Pate, 2010 WL 3921177, at *1.[2]  His petition for discretionary

review was refused on December 8, 2010, and he did not file a petition for writ of certiorari with

the United States Supreme Court.  In re Hall, No. PD-1325-10 (Tex. Crim. App. Dec. 8, 2010);

(D.E. 1, at 3).

Petitioner filed an initial state application for habeas corpus relief on December 21, 2010,

which the Texas Court of Criminal Appeals dismissed on February 9, 2011, because Petitioner's

direct appeal was still pending.  (D.E. 10-2, at 5, 2).  On February 22, 2011, he filed a second

state habeas application.  (D.E. 10-4, at 5).  On March 30, 2011, it, too, was dismissed, this time

because Petitioner failed to comply with Texas Rule of Appellate Procedure 73.1.  (D.E. 10-4, at

5, 2).  He filed his third state habeas application on April 20, 2011, challenging his conviction on

six grounds: (1) the prosecution suppressed favorable defense evidence in the form of witness

statements that would have helped Petitioner impeach the prosecution's witnesses; (2) the

---

[2] The court of appeals had issued an opinion on August 25, 2010 affirming Petitioner's conviction, which it
subsequently withdrew and replaced with its October 7, 2010 opinion.  Pate v. State, 2010 WL 3341853, No. 3-09-
00149-CR (Tex. App. Aug. 25, 2010) (unpublished) (withdrawn).

prosecution relied on perjured testimony from an expert witness overstating the accuracy of his evidence; (3) the court improperly admitted suggestive identification testimony; (4) the prosecution used demonstrably unreliable evidence; (5) the prosecution tampered with witnesses; and (6) Petitioner's trial counsel was ineffective.  (D.E. 1, at 4; D.E. 11-4).  On June 29, 2011, the Court of Criminal Appeals ordered the trial court to develop the record and enter findings of fact and conclusions of law.  (D.E. 11-3, at 2-4).  The trial court held a hearing pursuant to the order on August 24, 2011.  (D.E. 11-13; D.E. 11-14).  Based on these findings, the Court of Criminal Appeals denied Petitioner's writ application without written order.  (D.E. 11-7, at 19-25; D.E. 11-4, at 2).  Petitioner filed his federal petition on March 22, 2012.  (D.E. 1, at 10).

## IV.  PETITIONER'S ALLEGATIONS

Petitioner advances four grounds for habeas relief.  (D.E. 1, at 4, 6-7).  First, he claims that the prosecution suppressed favorable defense evidence consisting of witness statements given by Tracy Watson, as well as the victim's two daughters,  which, if available, would have helped Petitioner more effectively impeach those witnesses.  Second, he asserts that the prosecution relied on perjured testimony from Deputy Pikett that overstated the accuracy of his canine scent identification evidence.  Third, he maintains that his trial counsel was ineffective for three reasons because he failed to: (1) show the jury that the victim's daughters had identified other men as the perpetrators in earlier photographic lineups; (2) show that one daughter had at one point identified Underwood as the shooter; and (3) adequately investigate and cross-examine Deputy Pikett regarding the reliability of his canine scent lineups.  Finally, he claims that law enforcement officers presented impermissibly suggestive photographic lineups to the daughters that resulted in Petitioner being identified as a suspect, and, in addition, officers fabricated the

lineup shown to one of the daughters and coerced her to sign it.  (D.E. 1, at 6-7).

## V.  DISCUSSION

Respondent urges that Petitioner's claims should be dismissed because the claims are without merit.  (D.E. 12, at 1).

**A.      Federal Habeas Corpus Standard Of Review Pursuant To The AEDPA.**

Federal habeas relief is available to a state prisoner only if he is being held in violation of the Constitution, laws, or treaties of the United States.  Boyd v. Scott, 45 F.3d 876, 881 (5th Cir. 1994) (per curiam) (citation omitted).  Rule 56 of the Federal Rules of Civil Procedure generally applies to federal habeas corpus cases.  Clark v. Johnson, 202 F.3d 760, 764-65 (5th Cir. 2000) (citations omitted)); see also Fed. R. Civ. P. 81(a)(4) ("These rules apply to proceedings for habeas corpus....").

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), federal courts are prohibited from granting habeas relief unless a petitioner demonstrates that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," or was "based on an unreasonable determination in light of the facts." 28 U.S.C. § 2254(d); see also Cullen v. Pinholster, __ U.S. __, 131 S. Ct. 1388, 1398 (2011) ("hold[ing] that review under 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits"); Riddle v. Cockrell, 288 F.3d 713, 716 (5th Cir. 2002) (discussing § 2254(d)).  Thus, "federal habeas relief is only merited where the state court decision is both incorrect *and* objectively unreasonable."  Morrow v. Dretke, 367 F.3d 309, 313 (5th Cir. 2004) (emphasis in original) (citing Williams v. Taylor, 529 U.S. 362, 411 (2000)). The AEDPA's provisions "ensure that state-court convictions are given effect to the extent

possible under law." <u>Bell v. Cone</u>, 535 U.S. 685, 693 (2002) (citing <u>Williams</u>, 529 U.S. at 403-04).

The Supreme Court has concluded that the "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meanings. <u>Bell</u>, 535 U.S. at 694 (citing <u>Williams</u>, 529 U.S. at 404-05). The <u>Bell</u> Court elaborated on the distinctions between "contrary to" and an "unreasonable application:"

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams* that an unreasonable application is different from an incorrect one.

<u>Id.</u> (internal citations omitted).

The Fifth Circuit has explained that the "contrary to" clause applies where a "state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." <u>Hill v. Johnson</u>, 210 F.3d 481, 485 (5th Cir. 2000) (citation omitted). The Fifth Circuit has further determined that "§ 2254(d) permits a federal habeas court 'to review only a state court's "decision" and not the written opinion explaining that decision.'" <u>St. Aubin v. Quarterman</u>, 470 F.3d 1096, 1100 (5th Cir. 2006) (citing <u>Neal v. Puckett</u>, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (per curiam)); <u>accord</u> <u>Anderson v. Johnson</u>, 338 F.3d 382, 390 (5th Cir. 2003) (citing <u>Neal</u>, 286 F.3d at 246). The state court's "ultimate decision" is to be tested for

reasonableness, "not every jot of its reasoning." <u>Santellan v. Cockrell</u>, 271 F.3d 190, 193 (5th

Cir. 2001). Furthermore, a state court need not cite, or "even be aware of [Supreme Court]

precedents, 'so long as neither the reasoning nor the result of the state-court decision contradicts

them.'" <u>Mitchell v. Esparza</u>, 540 U.S. 12, 16 (2003) (per curiam) (quoting <u>Early v. Packer</u>, 537

U.S. 3, 8 (2002)); <u>see</u> <u>also</u> <u>Harrington v. Richter</u>, __ U.S. __, 131 S. Ct. 770, 785 (2011)

(reaffirming that "§ 2254(d) does not require a state court to give reasons before its decision can

be deemed to have been 'adjudicated on the merits'").

      Absent a direct conflict with Supreme Court authority, habeas relief is available only if a

state court decision is objectively unreasonable. <u>Montoya v. Johnson</u>, 226 F.3d 399, 404 (5th

Cir. 2000). Indeed, AEDPA's deferential standard limits the federal court role in the review of

state convictions:

> [Section 2254(d)] preserves authority to issue the writ in cases
> where there is no possibility fairminded jurists could disagree that
> the state court's decision conflicts with this Court's precedents. It
> goes no farther. Section 2254(d) reflects the view that habeas
> corpus is a "guard against extreme malfunction in the state
> criminal justice systems," not a substitute for ordinary error
> correction through appeal.... As a condition for obtaining habeas
> corpus from a federal court, a state prisoner must show that the
> state court's ruling on the claim being presented in federal court
> was so lacking in justification that there was an error well
> understood and comprehended in existing law beyond any
> possibility for fairminded disagreement.

<u>Harrington</u>, 131 S. Ct. at 786-87 (citation omitted). The Fifth Circuit has further explained that a

federal district court "must reverse when [it] conclude[s] that the state court decision applies the

correct legal rule to a given set of facts in a manner that is so patently incorrect as to be

'unreasonable.'" <u>Gardner v. Johnson</u>, 247 F.3d 551, 560 (5th Cir. 2001). As with the "contrary

to" test, the focus of the "unreasonable application" test is "on the ultimate legal conclusion that

the state court reached and not on whether the state court considered and discussed every angle of evidence." Neal, 286 F.3d at 246.

Finally, "[t]he AEDPA requires that [the Court] presume correct the state court's findings of fact unless the petitioner 'rebut[s] the presumption of correctness by clear and convincing evidence.'" Morrow, 367 F.3d at 315 (quoting 28 U.S.C. § 2254(e)(1)). The presumption of correctness is also accorded to adjudications made during state post-conviction proceedings. Id. The burden to rebut the presumption of correctness remains on the petitioner even if the state "hearing was a 'paper' hearing and may not have been full or fair." Id. (citing Valdez v. Cockrell, 274 F.3d 941, 950-51 (5th Cir. 2001)). In some circumstances, findings of fact may be implied from conclusions of law. See Valdez, 274 F.3d at 948 n.11 ("The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact.") (citations omitted); Goodwin v. Johnson, 132 F.3d 162, 183-84 (5th Cir. 1997).

**B.      The Prosecution Did Not Commit a Brady Violation.**

Petitioner first claims that the prosecution failed to provide him with evidence that would have been favorable to his defense. (D.E. 1, at 6). Specifically, he argues that the prosecution did not disclose evidence tending to link another man, Justin Padgett, to the crime. Id. According to Petitioner, this evidence consisted of: (1) an official written statement by Ms. Watson indicating that the victim had owed drug money to Padgett; and (2) official written statements by the victim's daughters indicating that Padgett was present on the night of the victim's death. (D.E. 1, at 7, 15-16). Respondent argues that Petitioner's claim is without merit. (D.E. 12, at 10). The trial court held a habeas hearing at which the two main officers involved in

11

the case testified.  (D.E. 11-14, at 17, 23).  Based on their testimony, the trial court concluded that any existing written and recorded statements had been properly disclosed to defense counsel before trial.  (D.E. 11-7, at 21).

In Brady v. Maryland, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. 83, 87 (1963).  To establish a Brady violation, a defendant "'must show that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material' to his guilt or punishment."  Mahler v. Kaylo, 537 F.3d 494, 500 (5th Cir. 2008) (citations omitted).  If even one of these elements is lacking, inquiry into the others is unnecessary and the claim fails.  See Strickler v. Greene, 527 U.S. 263, 296 (1999) (no Brady violation where petitioner establishes only two out of the three components); Banks v. Thaler, 583 F.3d 295, 300 (5th Cir. 2009) ("Because Brady's materiality prong is *not* satisfied, the habeas relief for [petitioner's] conviction is VACATED.") (emphasis in original).  Evidence is considered "material" under Brady "only where there exists a 'reasonable probability' that had the evidence been disclosed the result at trial would have been different."  Wood v. Bartholomew, 516 U.S. 1, 5 (1995).  Furthermore, impeachment evidence may be material.  See United States v. Bagley, 473 U.S. 667, 676 (1985).

Petitioner has not demonstrated that the prosecution concealed favorable evidence from him or his counsel.  Indeed, as the record demonstrates and as the trial court found, all relevant and admissible evidence was, in fact, contained in the pre-trial discovery provided to defense counsel prior to trial.  (D.E. 11-7, at 23).  The only evidence Petitioner offers in support of his

claim that Ms. Watson and her two daughters gave additional written statements that were never

disclosed consists of Officer Baird's police report, in which he indicated that he "took

statements" from the three witnesses regarding Padgett.  (D.E. 1, at 34; D.E. 11-7, at 16, 34).

Because defense counsel never received any such statements, Petitioner claims the prosecution

committed a <u>Brady</u> violation.

      Officer Baird's use of the phrase "took statements" in his police report falls short of

establishing that three formal written statements implicating Padgett were actually recorded.

Indeed, as the trial court noted, in the police report the phrase "took statements" is often used

liberally, and may just as likely refer to spoken statements rather than "written statement[s]."

(D.E. 11-13, at 30-31).  Moreover, testimony presented at the state habeas hearing established

that any existing written statements given by Ms. Watson or her daughters had been disclosed to

the defense prior to trial.  (D.E. 11-14, at 20; 11-7, at 21).  The fact that none of those statements

implicate Padgett does not serve as evidence in support of Petitioner's claim.  (D.E. 11-7, at 1-6

(written statements by Tracy Watson); D.E. 1, at 35-40, and D.E. 1-1, at 1-9 (written statements

by the daughters)).

      Because Petitioner has not offered any evidence showing that additional, undisclosed

written statements exist, he has failed to meet his burden of establishing that favorable evidence

has been suppressed.  Therefore, it is respectfully recommended that Petitioner has failed to

establish a <u>Brady</u> violation.

**C.    Petitioner Has Not Established That The Prosecution Relied On Perjured
Testimony.**

      Petitioner next asserts that the prosecution knowingly offered perjured testimony when

Deputy Keith Pikett testified about the reliability of his scent lineup.  (D.E. 1, at 6, 18).  He

contends that Deputy Pikett overstated the accuracy of the canine scent tests when he claimed that out of all the scent tests ever conducted by the particular dogs used in Petitioner's case, one of the dogs had only erred twice while the two other dogs had never erred at all.  (D.E. 1, at 19). Respondent argues that Petitioner's claims are unfounded.  (D.E. 12, at 15).  Because Deputy Pikett was not present to testify at the habeas hearing, the state trial court concluded that it could "not determine the truthfulness of Deputy Pikett's rate of error in his dog scent line ups as there was not evidence presented ... directly that contradicts [his] testimony at trial."  (D.E. 11-7, at 24).  However, the trial court went on to find that "[e]ven if [Deputy Pikett's] testimony is to be disregarded, there is sufficient evidence that was admitted in the trial ... to support [Petitioner's] conviction for murder."  Id.

The Supreme Court has recognized that "prosecutorial misconduct may 'so infec[t] the trial with unfairness as to make the resulting conviction a denial of due process.'"  Greer v. Miller, 483 U.S. 756, 765 (1987) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)).  In order to establish a habeas claim, "the prosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'"  Id. (quoting Bagley, 473 U.S. at 676).  A petitioner has the burden of showing the prosecutor's action infected the trial with such unfairness that the conviction resulted from a denial of due process. Kutzner v. Johnson, 242 F.3d 605, 609 (5th Cir. 2001) (citations omitted).  The Fifth Circuit has determined that in order for a petitioner to prevail on a denial of due process claim because the prosecution knowingly used perjured testimony, or allowed untrue testimony to go uncorrected, the petitioner must prove that: "(1) the testimony was actually false, (2) the state knew it was false and (3) the testimony was material."  Faulder v. Johnson, 81 F.3d 515, 519 (5th Cir. 1996)

14

(citation omitted).  Testimony is "material" if it could "in any reasonable likelihood have affected the judgment of the jury."  Giglio v. United States, 405 U.S. 150, 154 (1972) (citation omitted).

Petitioner offers the following evidence, all of which tends to discredit Deputy Pikett's reliability as an expert in canine scent lineups, as proof that he testified untruthfully at trial: (1) a list of criminal and civil cases, (D.E. 1, at 36); (2) a citation to a paper by attorney Derick Smith, Id.; (3) a report by the Innocence Project of Texas and accompanying supporting affidavits, id. at 12-40; (D.E. 11-30, at 1-54); (4) the testimony of Steven Nicely in State v. Smith, No. 14-09-00977-CR (Tex. App. Feb. 10, 2011) (D.E. 11-29, at 1-68); (5) an excerpt from a book discussing the reliability of scent identification, (D.E. 11-30, at 55-68); and (6) references to news articles, (D.E. 1, at 36).  While Petitioner's evidence more than adequately calls into question the reliability and accuracy of Deputy Pikett's scent lineups, Petitioner's claim nevertheless fails.  Without reaching the question of whether Deputy Pikett testified falsely regarding the reliability of his tests, this Court finds that Petitioner has failed to show both that the prosecution knowingly offered false testimony and that Deputy Pikett's testimony regarding his accuracy was material.

First, Petitioner offers no evidence to indicate that the prosecution was aware of any allegedly false testimony offered by Deputy Pikett.  The record suggests, if anything, that the prosecution was offering this testimony in reliance on Texas case law, which the trial court determined had established Deputy Pikett as an expert in the field of scent lineups.  (D.E. 9-21, at 9; D.E. 11-7, at 22); see also Winston, 78 S.W.3d at 528-29 (holding that Deputy Pikett was a qualified expert).  Second, as the trial court concluded, Deputy Pikett's testimony was

15

immaterial in light of the record as a whole.  (D.E. 11-7, at 22).  Even if his testimony had been struck in its entirety, the evidence stacked against Petitioner otherwise would have been sufficient to support his conviction.  For example, both daughters of the victim identified Petitioner as being present the night of the murder, and three co-conspirators all testified that he was the gunman.  Moreover, the prosecution established Petitioner's motive for committing the crime: loyalty to his gang, the Aryan Circle.  Thus, while Deputy Pikett's testimony may have been erroneous, its absence would not have affected the jury in any reasonable likelihood.

In sum, it is respectfully recommended that Petitioner has failed to show that the prosecution relied on perjured testimony.

**D.     Petitioner Did Not Receive Ineffective Assistance of Counsel.**

Petitioner alleges that his trial counsel, Stan Turpen, was ineffective because he failed to: (1) show the jury that the two daughters had identified other men as the perpetrators in earlier photographic lineups; (2) show that one daughter had previously identified Underwood as the gunman; and (3) investigate and cross-examine Deputy Pikett regarding past misidentifications in his canine scent lineups.  (D.E. 1, at 6-7).  Petitioner claims that counsel's deficiencies were so serious as to affect the outcome of the case.  Id. at 22-25.  Respondent argues that Petitioner's counsel was not ineffective and contends that the state trial court's finding on the matter was reasonable.  (D.E. 12, at 21).  After the habeas hearing, the state trial court determined that "[Petitioner's] trial Counsel, Stan Turpen[,] was not deficient, as the many allegations made by [Petitioner] are inaccurate and also related to trial strategy by trial counsel." (D.E. 11-7, at 24).

To prevail on a claim of ineffective assistance of counsel, a state prisoner seeking federal habeas corpus relief bears the burden of showing that: (1) counsel's performance was deficient;

16

and (2) the deficient performance resulted in actual prejudice.  Strickland v. Washington, 466 U.S. 668, 687 (1984).  However, a reviewing court need not consider both prongs if the court concludes that petitioner has failed to prove either.  Id. at 697; Amos v. Scott, 61 F.3d 333, 348 (5th Cir. 1995) (citation omitted).  The Fifth Circuit has determined that "under AEDPA a state court decision rejecting a *Strickland* claim must be accepted unless it was an unreasonable application of its teaching."  Granados v. Quarterman, 455 F.3d 529, 534 (5th Cir. 2006).

In order to show counsel's performance was deficient, petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Strickland, 466 U.S. at 687.  He must demonstrate that counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional standards.  See Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998).

Counsel's challenged conduct should be evaluated from the perspective of counsel at the time the conduct occurred.  Strickland, 466 U.S. at 690.  Due to the difficulties inherent in engaging in this analysis without being tainted by "the distorting effects of hindsight," a court's review should be highly deferential to counsel.  Id. at 689.  The reviewing court must give great deference to counsel's performance, strongly presuming that counsel has exercised reasonable professional judgment.  Id. at 690; see also Romero v. Lynaugh, 884 F.2d 871, 876 (5th Cir. 1989) ("strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance") (quoting Strickland, 466 U.S. at 689).

The Fifth Circuit has explained that due to "the almost infinite variety of possible trial techniques and tactics available to counsel, this Circuit is careful not to second guess legitimate strategic choices."  Yohey v. Collins, 985 F.2d 222, 228 (5th Cir. 1993).  In addition, "[a]

17

conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." Johnson v. Dretke, 394 F.3d 332, 337 (5th Cir. 2004) (internal quotation marks and citations omitted); accord United States v. Jones, 287 F.3d 325, 331 (5th Cir. 2002) (citation omitted).

Pursuant to the second prong of the Strickland two-part test, Petitioner may not simply allege, but must affirmatively prove, actual prejudice resulting from the ineffective assistance of counsel. Strickland, 466 U.S. at 693. Thus, he must affirmatively show that his counsel's actions deprived him of a fair trial. See Czere v. Butler, 833 F.2d 59, 63-64 (5th Cir. 1987). Prejudice results when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Strickland, 466 U.S. at 694; see also Lockhart v. Fretwell, 506 U.S. 364, 372 (1993) (habeas petitioner must show that the trial result was unreliable, or the proceeding was fundamentally unfair due to counsel's deficient performance) (citations omitted).

Petitioner has the burden of proof under the Strickland test. See Carter v. Johnson, 131 F.3d 452, 463 (5th Cir. 1997) (holding burden of proof is on petitioner in a federal habeas proceeding). In addition, conclusory allegations of ineffective assistance of counsel do not give rise to a constitutional claim for federal habeas relief. Collier v. Cockrell, 300 F.3d 577, 587 (5th Cir. 2002) (citations omitted); see also Miller v. Johnson, 200 F.3d 274, 282 (5th Cir. 2000) ("Because [petitioner] failed to set forth the nature of *any* of the errors trial counsel purportedly failed to preserve and did not set forth any resulting prejudice, the district court properly determined that these three claims of ineffective assistance were conclusory.") (emphasis in

18

original).

Finally, in order to prove that he is entitled to federal habeas relief due to ineffective assistance of counsel, Petitioner must overcome the presumption of correctness to which the state court's findings are entitled.  See Schaetzle v. Cockrell, 343 F.3d 440, 444 (5th Cir. 2003) ("It bears repeating that the test for federal habeas purposes is *not* whether [petitioner made a showing under Strickland, but] ... whether the state court's decision—that [the petitioner] did *not* make the *Strickland*-showing—was contrary to, or an unreasonable application of, the standards, provided by clearly established federal law (*Strickland*), for succeeding on his [ineffective assistance] claim.") (emphasis in original).

### 1)   Trial counsel was not ineffective for failing to show the jury that the victim's daughters had identified other men as perpetrators in earlier photographic lineups.

Petitioner contends that his trial counsel, Mr. Turpen, was ineffective because he did not cross-examine the daughters regarding their earlier identifications of other men in photographic lineups.  (D.E. 1, at 7, 22).  Specifically, prior to trial one daughter had identified "Charles" in a photo lineup and the other daughter had identified a man named "Ace."  (D.E. 1-1, at 1-2, 4-5). According to Petitioner, Mr. Turpen's failure to cross-examine the girls regarding the lineups caused "the jury to put more faith in their testimony than was due."  (D.E. 1, at 7, 22).

Though Mr. Turpen did indeed decline to question both daughters regarding their past identifications, he explained at the habeas hearing that his decision was part of his trial strategy, stating that it would have been "against [his] client's interest" to do otherwise.  (D.E. 11-13, at 60).  In particular, Mr. Turpen was concerned about traumatizing the two young girls in front of the jury.  (D.E. 11-13, at 59-60, 63).  He also indicated that he felt further impeaching them was

unnecessary because both girls made numerous other inconsistent statements on the stand.  (D.E. 11-13, at 59-60).  Moreover, Mr. Turpen was able to elicit testimony from the daughters implicating the men referred to as  "Charles" and "Ace" in the murder, (D.E. 9-25, at 55; D.E. 9-26, at 26, 40), and Petitioner's co-defendant's counsel, Mr. Gilmore, pursued some questions regarding the photo lineups in his cross-examination of one daughter.  (D.E. 9-25, at 59-63).  Finally, Mr. Turpen was able to highlight the girls' inconsistent statements in his closing arguments.  (D.E. 11-13, at 60, 63-64).

In light of these considerations, Petitioner has failed to establish that Mr. Turpen's representation was deficient for failing to cross-examine the daughters regarding the photographic lineups.  Therefore, it is respectfully recommended that Petitioner was not denied effective assistance of counsel in this regard.

> **2)   Trial counsel was not ineffective for failing to show that one daughter had previously identified Michael Underwood as the gunman.**

Petitioner also claims that his counsel was ineffective because Mr. Turpen failed to show the jury that one daughter had previously identified Michael Underwood as the gunman.  (D.E. 1, at 7).  As Mr. Turpen explained at the habeas hearing, his decision not to press the daughter regarding her past identifications was a strategic one.  (D.E. 60, 62-63).  As such, his representation was not deficient.  Therefore, it is respectfully recommended that Petitioner has not established that he was denied effective assistance of counsel in this regard.

> **3)   Trial counsel was not ineffective for failing to adequately investigate and cross-examine Deputy Pikett regarding his canine scent lineup.**

Finally, Petitioner claims that Mr. Turpen inadequately investigated Deputy Pikett's qualifications as an expert in scent identification, which consequently limited Mr. Turpen's

ability to impeach the witness on cross-examination.  (D.E. 1, at 7, 24).  He asserts that "[c]ounsel failed to do any kind of a background check on [Pikett] aside from asking him personally how accurate his dogs were."  (D.E. 1, at 24).  Petitioner's assertion is simply not true. As the trial court found and as the record clearly reveals, Mr. Turpen investigated Deputy Pikett to the best of his ability and conducted a thorough cross-examination of the witness based on the information he had before him.  (D.E. 11-7, at 22, 24; D.E. 11-13, at 65-66).

The law imposes on defense counsel a duty to "conduct a reasonable amount of pretrial investigation."  Lockhart v. McCotter, 782 F.2d 1275, 1282 (5th Cir. 1986) (citing Nealy v. Cabana, 764 F.2d 1173, 1177 (5th Cir. 1985)).  As the Supreme Court explained in Strickland, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  Sonnier v. Quarterman, 476 F.3d 349, 358 (5th Cir. 2007) (citing Strickland, 466 U.S. at 691).  However, "[t]o establish that an attorney was ineffective for failure to investigate, a petitioner must allege with specificity what the investigation would have revealed and how it would have changed the outcome of the trial." Miller v. Dretke, 420 F.3d 356, 361 (5th Cir. 2005).  Furthermore, under Strickland, Petitioner is required to show "a reasonable probability that the outcome of the proceeding would have been different if counsel's performance had been sufficient."  Conner v. Quarterman, 477 F.3d 287, 294 (5th Cir. 2007) (citing Strickland, 466 U.S. at 693).  "A reasonable probability is a probability sufficient to undermine the confidence in the outcome of the trial."  Sonnier, 476 F.3d at 356 (citation omitted).

Here, Petitioner has failed to establish that his counsel's representation was deficient.  At the habeas hearing, Mr. Turpen described his pre-trial investigation of Deputy Pikett.  (D.E. 11-

13, at 66-69).  According to Mr. Turpen, he checked around with other attorneys to see if they knew anything about the witness and he gathered information from one attorney who had dealt with Deputy Pikett in another case.  Id. at 66.  Mr. Turpen also conducted legal research regarding Deputy Pikett and discovered that he had been admitted as an expert in one of the leading cases at the time.  Id.  Based on this information, he made a motion to suppress Deputy Pikett's testimony at trial.  (D.E. 9-21, at 25-28).  He also conducted a thorough cross-examination of the witness and highlighted Deputy Pikett's reliability, or lack thereof, in closing arguments.  Id. at 47-61; (D.E. 9-27, 73-75).  Petitioner offers no evidence suggesting that Mr. Turpen could have discovered additional information revealing Deputy Pikett's past misidentifications prior to trial.  The evidence Petitioner does cite as discrediting the expert was, for the most part, publicized only after trial.[3]  (D.E. 1-1, at 12).

Absent any evidence to contradict Mr. Turpen's testimony, Petitioner has not shown that his counsel was deficient in investigating and cross-examining Deputy Pikett.  Therefore, it is respectfully recommended that Mr. Turpen did not render ineffective assistance of counsel in his investigation and cross-examination of Deputy Pikett.

**E.      The Prosecution Did Not Use Impermissibly Suggestive Photographic Lineups.**

Finally, Petitioner claims that the prosecution relied on impermissibly suggestive photographic lineups and that one of the lineups was, in fact, fabricated on the eve of trial.  (D.E. 1, at 7).  The argument he offers in support of his first claim makes little, if any, sense.

---

[3] Among other things, Petitioner offers the expert testimony of Steven Nicely recorded as part of a pretrial motion on September 12, 2007, in the case State v. Smith, No. 14-09-00977-CR. Though Mr. Nicely's testimony discredits Deputy Pikett's reliability as an expert, up until October 23, 2009, the trial court in Smith found Deputy Pikett's evidence admissible despite Mr. Nicely's testimony.  See Smith v. State, 335 S.W.3d 706, 710 (Tx. App. 2011) (affirming trial court's order excluding Deputy Pikett's testimony).  Furthermore, Petitioner has not shown that it was reasonably available to his counsel prior to trial.

Petitioner appears to take issue with the methodology used to prepare the photographic lineups from which the victim's daughters identified him as being present the night of the killing. Id. at 7, 40. He claims that while the prosecution created only one photographic lineup for all other suspects in the case–such that the same lineup for each suspect was shown to both girls– it created three unique lineups for Petitioner. Id. at 25-26. In Petitioner's three photographic lineups, he was featured in a different position, and presented alongside a different set of individuals, in each. Id. at 25-28; (D.E. 11-14, at 25-26). Of the three lineups created for Petitioner, only two were actually used. (D.E. 1, at 27; D.E. 11-14, at 27, 34). One was shown to one daughter and another was shown to the other. Id. Based on these facts alone, Petitioner insists that the photographic lineups in which the girls identified him as being present the night of the killing were impermissibly suggestive.

In addition, Petitioner argues that the photographic lineup from which one daughter identified him was a "last minute fabrication" by Investigator Brooks. (D.E. 1, at 25). He maintains that Investigator Brooks created the lineup just days before trial, backdated the document, and then coerced one of the daughters into signing it. Id. As evidence, Petitioner points to the fact that the prosecution did not provide that particular lineup to defense counsel until almost a year after it was dated, which was shortly before trial. Id. at 26. Moreover, as proof that the girl was coerced in Petitioner's lineup, he cites her trial testimony regarding an erroneous identification she had made of another suspect in a separate pretrial photographic lineup. Id. at 28. When asked by defense counsel why, in one of the pretrial lineups, she had identified a man who she did not recognize, she testified that "[s]he was just picking one 'cause [she] thought [she] had to.'" (D.E. 9-25, at 62-63).

23

Respondent contends that both of Petitioner's claims are unfounded.  (D.E. 13, at 25).
After the habeas hearing, the trial court drew the following relevant conclusions: (1) "Having
[Petitioner] placed in different positions in three line ups was to ensure the accuracy of the
identification by the victims [sic] daughters and was to prevent the two daughters from being
able to share any information between themselves;" and (2) "[T]here was no fabrication of any
photo line up of [Petitioner]."  (D.E. 11-7, at 22).

The Due Process Clause prohibits identification testimony at trial that follows a pretrial
photographic identification "if the photographic identification procedure [is] so impermissibly
suggestive as to give rise to a very substantial likelihood of misidentification."  Simmons v.
United States, 390 U.S. 377, 384 (1968); see also Neil v. Biggers, 409 U.S. 188, 198 (1972) ("It
is the likelihood of misidentification that violates the defendant's right to due process.").
Determining whether there was a substantial likelihood of misidentification involves a two-step
inquiry.  First, the court must determine whether the lineup was impermissibly suggestive.
Second, the court must consider whether, based on the totality of circumstances, the lineup posed
a substantial likelihood of misidentification.  Simmons, 390 U.S. at 384; see also Biggers, 409
U.S. at 199 (noting that in the context of testimony regarding an out of court identification where
the witness does not make an in court identification as well, the likelihood of misidentification
need not be "irreparable").  In assessing the likelihood of misidentification, courts are instructed
to consider the following factors: "[1] the opportunity of the witness to view the perpetrator at
the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior
description of the criminal, [4] the level of certainty demonstrated by the witness at the time of
confrontation, and [5] the length of time between the crime and the confrontation."  Biggers, 409

24

U.S. at 199-200; <u>accord</u> <u>Cooks v. Johnson</u>, 265 F.3d 1060, 2001 WL 872899, at *7 (5th Cir. July 12, 2001) (per curium) (unpublished).

Applying the two-step inquiry to Petitioner's claim, the prosecution's use of the lineups featuring Petitioner did not amount to a due process violation.  First, the lineups were not impermissibly suggestive when considered either standing alone or in conjunction with the lineups created for the other suspects.  Because each girl was each shown only one photographic lineup per suspect, and because neither was given an opportunity to inspect and compare the lineups presented to the other girl, any discrepancies between the various suspects' lineups would necessarily go undetected.  Moreover, as the trial court found, the officers who created Petitioner's lineups purposely varied Petitioner's position among them to ensure the accuracy of the identification.  (D.E. 11-7, at 22).  Done this way, neither daughter could communicate Petitioner's position to the other before both had completed their respective lineups.  Thus, despite Petitioner's argument, the photographic lineups were not impermissibly suggestive.

Second, an examination of the <u>Biggers</u> factors reveals that the photographic lineups did not result in a substantial likelihood of misidentification.  For instance, the record indicates that both girls had ample time to view the perpetrators as they were entering the trailer.  (D.E. 9-25, at 42-49).  Moreover, given the abnormal and disruptive nature of the incident, their attention was naturally focused on the men who were invading their home.  One daughter's description of the firearm as a "western kind" proved to be consistent with the gun actually recovered, indicating a high degree of accuracy.  (D.E. 9-25, at 44).  In addition, both girls were able to identify Petitioner in the lineups upon first viewing and the identifications took place only

twelve days after the murder.[4]  (D.E. 11-7, at 21-22).  Considering these factors in light of the totality of circumstances, Petitioner has not shown a substantial likelihood of misidentification. Therefore, it is respectfully recommended that Petitioner has failed to establish the prosecution's reliance on impermissibly suggestive photographic lineups.

The Court now turns to Petitioner's final allegation, that Investigator Brooks fabricated the lineup in which one daughter identified Petitioner.  As the trial court rightfully concluded, Petitioner's claim is entirely unfounded.  (D.E. 11-7, at 22).  At the habeas hearing, Investigator Brooks testified that he did not reconstruct or fabricate the photographic lineup shown to her. (D.E. at 11-14, at 28).  Instead, he suggested that the reason the lineup was not turned over to defense counsel until shortly before trial was due to innocent miscommunication.  (D.E. 11-14, at 31-34).  Moreover, Investigator Brooks testified that he did not coerce either of the girls to pick a particular person out of Petitioner's lineup.  (D.E. 11-14, at 25).  As Petitioner offers no evidence to dispute Investigator Brooks's testimony, it is respectfully recommended that the prosecution did not fabricate the photo lineup in which the one daughter identified Petitioner.

## VI.  CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the Fifth Circuit from a final order in a habeas corpus proceeding "[u]nless a circuit justice or judge issues a certificate of appealability."  28 U.S.C. § 2253(c)(1)(A).  Although Petitioner has not yet filed a notice of appeal, it is respectfully recommended that this Court nonetheless address whether he would be entitled to a certificate of appealability.  A district court ruling on a petitioner's relief may sua sponte rule on a certificate

---

[4] The incident took place on January 4, 2008, and the girls were shown photographic lineups featuring Petitioner on January 16, 2008.  (D.E. 11-7, at 21).

of appealability because it "is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before that court.  Further briefing and argument on the very issues the court has just ruled on would be repetitious."  Alexander v. Johnson, 211 F.3d 895, 898 (5th Cir. 2000) (per curiam).

The statute establishes that "[a] certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits."  Miller-El v. Cockrell, 537 U.S. 322, 336 (2003).  To warrant a grant of the certificate as to claims denied on their merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).  This standard requires a § 2254 petitioner to demonstrate that "reasonable jurists could debate whether ... the [petition] should have been resolved in a different manner or that the issues presented ... deserve[d] encouragement to proceed further."  United States v. Jones, 287 F.3d 325, 329 (5th Cir. 2002) (citation omitted).

As to claims district courts reject solely on procedural grounds, a petitioner must show both "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  Slack, 529 U.S. at 484 (emphasis added).

It is respectfully recommended that reasonable jurists could not debate this denial on substantive or procedural grounds nor find that the issues presented are adequate to proceed.  Miller-El, 537 U.S. at 327 (citing Slack, 529 U.S. at 484).  Accordingly, it is respectfully

27

recommended that the Court find that Petitioner is not entitled to a certificate of appealability.

## VII.  RECOMMENDATION

Based on the foregoing reasons, it is respectfully recommended that Respondent's motion for summary judgment, (D.E. 12), be granted, and that this habeas petition, (D.E. 1), be dismissed.  Additionally, it is respectfully recommended that Petitioner be denied a certificate of appealability.

Respectfully submitted this 31st day of August 2012.

_____
BRIAN  L. OWSLEY
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to 28 U.S.C. § 636(b)(1); Rule 72(b) of the Federal Rules of Civil Procedure; Rule 8(b) of the Rules Governing § 2254 Cases; and Article IV, General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415 (5th Cir. 1996) (en banc).